ORDERED.

Dated:  March 03, 2023

*Jerry A. Funk*
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:                                                                      Case No. 3:22-bk-00267-JAF

ANDREW CHEDDA and
MIOSOTIS CHEDDA,

       Debtors.
_____/

DOREEN ABBOTT,
Chapter 7 Trustee,

       Plaintiff,                                              Adversary Pro. No. 3:22-ap-0025-JAF

v.

ANDREW CHEDDA and
MIOSOTIS CHEDDA,

       Defendants.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

       This Proceeding came before the Court for a trial on November 3, 2022, on the Complaint filed by Doreen Abbott, the Chapter 7 Trustee (the "Trustee"), against Andrew

Chedda and Miosotis Chedda (the "Debtors"). By the Complaint, the Trustee objects to the entry of the Debtors' discharge pursuant to 11 U.S.C. § 727(a)(2)(A) and § 727(a)(4)(A). At the conclusion of the trial, the Court took the matter under advisement, and afforded the parties the opportunity to submit post-trial briefs. For the reasons discussed herein, the Court finds the facts and circumstances of this Proceeding do not warrant a denial of the Debtors' discharge.

### Findings of Fact

On February 10, 2022, the Debtors filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code.[1] Along with the filing of their petition, the Debtors filed their Schedules A-J (the "Schedules") and Statement of Financial Affairs ("SOFA"). (Tr.'s Ex. 1).

Prior to moving to Florida in 2018, the Debtors resided in New Jersey, along with their children, where Mr. Chedda had a long history of working in law enforcement. Mr. Chedda testified that the family moved to Florida to help care for his elderly mother and because he was diagnosed with kidney cancer, among other reasons. The Debtors used the majority of the proceeds from the sale of their New Jersey home for a down payment on a home in Florida and for substantial renovations that needed to be completed on the home.

Various reasons contributed to the Debtors' need to file for bankruptcy. Specifically, Mr. Chedda's job in Florida paid less than his previous job in New Jersey, the Debtors' new home in Florida was a "fixer upper" in need of various repairs, the Debtors incurred an unexpected $10,000 tax obligation, and Mr. Chedda continued to deal with significant health issues.

On March 24, 2022, the Trustee held and concluded the Section 341 Meeting of Creditors (the "Meeting of Creditors"). During the Meeting of Creditors, certain valuation issues arose, which led the Trustee to file an Objection to Debtors' Claim of Exemptions (the "Objection to

---

[1] As noted by the Trustee, the Debtors have filed previous cases. As reflected on the Court's docket, the Debtors' last case was a jointly filed Chapter 13 case in 2007, which was subsequently dismissed in 2009 for failure to make plan payments. (Case No. 3:07-bk-02957-JAF).

Exemptions") and a Motion for Turnover of Property (the "Motion for Turnover") (Tr.'s Exs. 2, 3).

On their Schedules, the Debtors listed two cars and a motorcycle in which they have an interest. The motorcycle is a 2007 Yamaha (the "Motorcycle"), with approximately 42,000 miles. (Tr.'s Ex. 1). Mrs. Chedda testified at the 2004 Examination, that the Motorcycle was purchased in August of 2020 for approximately $1,500. (Tr.'s Ex. 5, pp. 23-24). On their Schedules, the Debtors valued the Motorcycle at $500 and indicated it was in poor condition. (Tr.'s Ex. 1). The Trustee, however, asserted that the Debtors' valuation of the Motorcycle was too low, and moved for turnover. (Tr.'s Ex. 3). Prior to the trial, the Debtors surrendered the Motorcycle, which was sold at a public action for $2,200. At the trial, Mr. Chedda testified that he valued the Motorcycle at only $500 based on the mileage, rust on the bars and frame, and because it rattled and needed new tires.

The Debtors also listed a 2010 Toyota RAV4 (the "RAV4") on their schedules and valued the vehicle at $1,500. (Tr.'s Ex. 1). The Debtors specifically noted on their schedules that the RAV4 was in "[p]oor condition – needs repairs 4 wheel drive mechanism broken – needs re-welding." Id. Mr. Chedda testified that the RAV4 was originally his sister's vehicle and that it has serious mechanical issues, including suspension problems and the axle having to be re-welded. He also stated that he thought the RAV4 was only safe to drive short distances, and even considering increased values in the used car market, he would not feel comfortable selling the vehicle for more. Mrs. Chedda, the primary driver of the RAV4, expressed similar concerns as to the vehicle's mechanical issues and testified that at the time the Schedules were filled out she thought $1,500 was a fair valuation for the vehicle. Admittedly, the Debtors' valuation was based solely on their opinion of what the vehicle was worth, given the serious mechanical issues.

Conversely, the Trustee's expert appraiser, Peter Mocke, testified that he would put the average retail price of the RAV4 at between $10,000 to $13,000 and that at an auction the vehicle would likely bring between $6,500 and $9,000. However, Mr. Mocke also testified that his appraisal of the RAV4 was a "desktop appraisal" based on photographs and that he would need to get a damage report from a certified mechanic to assess how the vehicle's mechanical issues affected the valuation.

The newest vehicle listed by the Debtors was a 2019 Chrysler 300 (the "Chrysler"), which they described as being in good condition, with approximately 26,000 miles.[2] Despite having purchased the Chrysler in May of 2021 for $23,511.05, the Debtors initially valued the vehicle on their Schedules at only $4,500. (Tr.'s Exs. 1, 12). Mr. Chedda testified that when he filled out his Schedules he misunderstood the question and thought he should value the Chrysler based on the bank's lien amount versus the fair market value. After being informed at the Meeting of Creditors that he had utilized an improper methodology to value the Chrysler, Mr. Chedda testified that he looked at the Kelly Blue Book value which showed valuations ranging from $17,000 and up for similar vehicles. At trial, Mr. Mocke testified that in his professional opinion the average retail value for the Chrysler would be between $20,000 and $24,000, and he would expect the vehicle to bring between $15,000 and $18,000 at an auction.

In addition to the valuation issue on the Chrysler, the Trustee alleges that within one year prior to the petition date, the Debtors utilized their former truck, a 2016 Chevrolet Silverado, as a trade-in vehicle towards the purchase of the Chrysler and failed to disclose this information on their initial SOFA. In response, Mr. Chedda testified that, although he received a trade-in credit of $18,500 from the Silverado when he purchased the Chrysler, he viewed the transaction as a

---

[2] On their initial Schedules, the Debtors mistakenly listed the year of the Chrysler as a 2018. However, Mr. Chedda readily acknowledged at the Rule 2004 Examination that the Chrysler is a 2019 model. (Tr.'s Ex. 5, p. 25).

straightforward trade-in, not as a "transfer." Notably, Mr. Chedda stressed during his testimony that he made the decision to trade-in the Silverado for the Chrysler for the purpose of lowering his monthly car payment during difficult financial times and that the trade-in resulted in a savings of almost $200 per month.

In addition to the vehicles discussed above, the Trustee also questioned the Debtors as to their previous interest in a 2011 Hyundai Sonata (the "Sonata"), and a 2017 Nissan Altima (the "Altima"), which they transferred to their children prepetition. (Tr.'s Exs. 17-20). Mr. Chedda testified he transferred his interest in the Sonata to his son in 2020, when his son completed basic training in the United States Air Force, and that the vehicle is in Arizona where his son lives. Mrs. Chedda further testified that although the Sonata was originally her car, the intent was always to give the Sonata to their son. With respect to the Altima, the vehicle was initially purchased in Mr. Chedda's name in 2016 and subsequently transferred on February 2, 2021, to their daughter. (Tr.'s Exs. 19, 20). Mr. Chedda testified that the Altima was always intended to be their daughter's car, but that she was not officially gifted the Altima until she graduated from high school. He further testified that their daughter commutes to college and work in the Altima, which is a safer vehicle than the RAV4. Mrs. Chedda likewise testified that they gave the Altima to their daughter as a high school graduation present, and they always intended for her to possess the Altima. The Cheddas maintain that because they always considered the Sonata and Altima to be their children's vehicles, that they did not list them as transfers on their initial SOFA.

At trial, the Trustee also questioned the Debtors about funds held in their checking and savings accounts. On their Schedules, the Debtors listed a Vystar Credit Union Checking Account (the "Checking Account") with funds in the amount of $320 and a Vystar Credit Union

Savings Account (the "Savings Account") in the amount of $500, for a total amount of $820. (Tr.'s Ex. 1). However, the Trustee alleges that as of the petition date, the Checking Account had funds in the amount of $2,925.94, and the Savings Account had funds in the amount of $1,625.06, for a total of $4,551.00. (Tr.'s Exs. 15, 16). In response, Mr. Chedda testified that the figures listed on the Schedules were consistent with how he balanced his checkbook and that he had subtracted amounts for checks that he had written but were not yet cashed. As for the Savings Account, Mrs. Chedda testified that the $1,500 withdrawn two days post-petition was to pay their homeowner's insurance deductible for a roofing job and that the remainder went towards paying their bankruptcy attorney.

At the conclusion of the trial, the Court directed the Debtors to turn over the Chrysler and RAV4 to the Trustee, and an Order Granting in Part and Denying in Part the Trustee's Motion for Turnover of Property (the "Turnover Order") was subsequently entered. (Main Case, Doc. 56). In their post-trial brief, the Debtors' attorney represented that the Debtors timely surrendered the Chrysler and RAV4 to the Trustee.[3]

Following the hearing, the Debtors filed Amended Schedules and an Amended SOFA, which included amended valuations for the Motorcycle and the Chrysler, as well as listing the transfers of the Silverado, Sonata, and Altima. (Main Case, Docs. 48, 49).

## Conclusions of Law

"In a Chapter 7 proceeding, an individual debtor receives an immediate unconditional discharge of personal liabilities for debts in exchange for the liquidation of all non-exempt assets." Schultz v. U.S., 529 F.3d 343, 346 (6th Cir. 2008). "The Bankruptcy Code favors discharge of the honest debtor's debts and provisions denying a debtor's discharge are construed

---

[3] The Motorcycle was surrendered prior to the trial.

liberally in favor of the debtor and strictly against the creditor." In re Allen, 553 B.R. 916, 922 (Bankr. M.D. Fla. 2016). The right to a bankruptcy discharge though is not limitless. Id. "Section 727 . . . provides that a debtor shall be granted a discharge unless one or more of twelve enumerated reasons to deny the discharge exists." Menotte v. Hahn (In re Hahn), 362 B.R. 542, 546 (Bankr. S.D. Fla. 2007). The Trustee seeks to have the Court deny the Debtors' discharge pursuant to 11 U.S.C. §§ 727(a)(2), and (a)(4).

**(A)     11 U.S.C. § 727(a)(2)(A)**

The Trustee asserts that the Debtors fraudulently failed to disclose the pre-petition transfer of the Silverado, and their discharge should therefore be denied pursuant to 11 U.S.C § 727(a)(2)(A).

"In order for an individual to get th[e] extraordinary relief [of a discharge], the Bankruptcy Code requires that a Chapter 7 debtor fulfill certain fundamental duties, the most essential of which is the complete and honest disclosure of assets and recent transfers by the debtor." Syngenta Seeds, Inc. v. Eigsti (In re Eigsti), 323 B.R. 778, 783 (Bankr. M.D. Fla. 2005). "When a debtor does not fully disclose assets or recent transfers on . . . sworn Schedules or Statements of Financial Affairs, the court may decide to deny discharge of debt pursuant to 11 U.S.C. § 727." Id. Section 727(a)(2)(A) provides that the court shall not grant a discharge if, within one year before the date of the filing of the petition, the debtor "with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed" property of the debtor. Under § 727(a)(2)(A), the objecting party must prove by a preponderance of the evidence that: (1) a transfer occurred; (2) the transfer was of the debtor's property; (3) the transfer was within one

7

year of the petition; and (4) the transfer was done with the intent to hinder, delay, or defraud a creditor or the trustee. Rumptz v. Rumptz (In re Rumptz), No. 3:19-AP-86-JAF, 2020 WL 2462528, at *4 (Bankr. M.D. Fla. May 12, 2020).

The Trustee asserts that the Debtors' transfer of the Silverado the year prior to the Petition Date warrants the denial of their discharge pursuant to § 727(a)(2)(A).

At the trial, Mr. Chedda testified that he traded in the Silverado for the Chrysler for the purpose of substantially lowering his monthly car payment. The Debtor's stated intent is supported by his decision to put the entire $18,500 of equity in the Silverado into the purchase of the Chrysler. Specifically, Mr. Chedda testified that his monthly car payment decreased by approximately $200.00. He also testified that he viewed the transaction as a trade-in, and not as a "transfer." The Court finds Mr. Chedda's testimony to be very credible. The evidence does not show that the Debtors' decision to trade-in the Silverado for the Chrysler was done with the intent of hindering, delaying, or defrauding their creditors.[4] The Debtors' testimony is reflective of a couple who was experiencing financial difficulties and attempted to decrease their monthly car payment in an attempt not to go further into debt. Therefore, the Court will not deny the Debtors' discharge under § 727(a)(2)(A).

**(B)    11 U.S.C. § 727(a)(4)(A)**

Section 727(a)(4)(A) provides for denial of a debtor's discharge if he "knowingly and fraudulently, in or in connection with the case—made a false oath or account." 11 U.S.C. § 727(a)(4)(A). The First Circuit has stated:

> [T]he very purpose of ... § 727(a)(4)(A) is to [ensure] that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to ensure that complete, truthful, and reliable information is put forward at the outset of the proceedings,

---

[4] The Trustee's argument regarding the Debtors not listing the $18,500 trade-in credit from the Silverado on their initial SOFA will be addressed under § 727(a)(4)(A).

so that decisions can be made by the parties in interest based on fact rather than fiction ... Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.

Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987).

A party seeking the denial of a discharge pursuant to § 727(a)(4)(A) must establish the following elements: 1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case. Shappell's Inc. v. Perry (In re Perry), 252 B.R. 541, 549 (Bankr. M.D. Fla. 2000). A false oath may involve a false statement or omission. Fogal Legware of Switzerland, Inc. v. Wills (In re Wills), 243 B.R. 58, 62 (9th Cir. BAP 1999). "There is a difference between a debtor who is trying to hide assets with a false oath or material omissions in his [schedules], and a debtor who, through inadvertence, mistake, or ignorance ... omits[s] certain assets." In re Dupree, 336 B.R. 520, 527 (Bankr. M.D. Fla. 2005). In determining whether a debtor has the requisite fraudulent intent, a court should analyze whether omissions or nondisclosures are "part of a scheme . . . to retain assets for [the debtor's] own benefit at the expense of his creditors." Id.

The Trustee asserts that the following actions by the Debtors warrant the denial of their discharge pursuant to § 727(a)(4)(A): 1) undervaluing the Motorcycle, RAV4, and Chrysler (the "Vehicles"); 2) not disclosing the transfers of the Silverado, Sonata, and Altima; and 3) failing to list the correct balance in their Vystar Checking and Savings accounts.

Although the Trustee persuasively argues why the Debtors' discharge should be denied under § 727(a)(4)(A), ultimately, as explained in detail below, the Court does not find the facts and circumstances of this case lead to a finding that the Debtors acted with the requisite fraudulent intent. Unlike the case upon which the Trustee heavily relies, and draws various

parallels to, the Court *does not* find that the actions of the Debtors in this case "appear worse than carelessness and tend towards evasiveness." Chancellor v. Martin (In re Martin), 239 B.R. 610, 614 (Bankr. M.D. Fla. 1999) (finding it "difficult to believe" that the debtor did not know that his 1970 Pontiac GTO was a collectible vehicle, despite keeping it in good condition for 29 years and that the debtor "feigned ignorance of its true worth in order to try to keep it after bankruptcy, and lied to the appraisers regarding its condition").

First, the Court does not find that the Debtors undervalued the Vehicles with fraudulent intent. Although the Debtors valued the Motorcycle at $500 on their initial Schedules, and the Trustee ultimately sold it at auction for $2,200, the Court finds the Debtors' valuation testimony to be reasonable. Mrs. Chedda testified at the 2004 Exam that the motorcycle was purchased in August of 2020 for approximately $1,500. (Tr.'s Ex. 5, pp. 23-24). At the trial, Mr. Chedda testified that he based the valuation on the Motorcycle's high mileage, rust on the bars and frame, and because it rattled and needed new tires. Given the testimony that the Motorcycle was purchased for approximately $1,500, coupled with the condition of the Motorcycle, the Court does not find that the Debtors valued the motorcycle with fraudulent intent. With respect to the RAV4, the Cheddas testified that the vehicle had significant mechanical issues, along with cosmetic blemishes. Notably, Mr. Chedda testified that the vehicle had a history of issues with the suspension, which necessitated re-welding, and that the car no longer functions as a four-wheel drive. Although the appraiser for the Trustee put a significantly higher value on the RAV4, his appraisal was admittedly a "desktop appraisal" which utilized photographs of the vehicle but did not account for any of the vehicle's serious mechanical issues. In fact, Mr. Mocke testified that he would have to get a damage report from a certified mechanic to assess how the vehicle's mechanical issues affected valuation. Upon consideration of Mr. Chedda's

detailed history of the RAV4's mechanical issues, along with Mr. Mocke's statement regarding the need for a damages report, the Court does not find that the Debtors undervalued the RAV4 with fraudulent intent.

With respect to the Chrysler, although the extremely low valuation initially listed by the Debtors on their Schedules is problematic, the Court does not find it was done with fraudulent intent. Mr. Chedda testified in detail on this issue and, although his reasoning was unquestionably misguided, the Court found him to be forthright. Specifically, Mr. Chedda testified that he misunderstood the question and thought he should value the Chrysler at $4,500 based on the lien amount. He further testified, that he did not utilize the same methodology for the Motorcycle and RAV4 because they were not encumbered by a lien. There is no dispute that the Chrysler was *significantly* undervalued. However, the Court finds the Debtors' valuation, albeit misguided, was not purposefully done with the intent to deceive. Because the Chrysler was listed as a 2018 model,[5] in good condition with no mechanical issues, the low valuation should likely have been questioned by their attorney prior to filing the Schedules with the Court. And most certainly, after the issue came to light at the Meeting of Creditors, the Debtors' attorney should have *promptly* filed amended schedules, instead of waiting to do so until after the trial. Regardless, based on the testimony and demeanor of the Debtors, the Court finds the undervaluation of the Chrysler was not done with fraudulent intent.

Next, the Court will discuss the Trustee's allegations with respect to the Debtors not initially disclosing the transfers of the Silverado, Sonata, and Altima on their SOFA. As for the Silverado, Mr. Chedda credibly testified that he did not view the trade-in of the Silverado for the Chrysler as a "transfer" but as a straightforward trade-in for the purpose of significantly lowering

---

[5] As previously stated, the Chrysler was initially listed in error on the Debtors' Schedules as a 2018 model instead of a 2019 model.

11

his monthly car payments during a difficult financial time. Notably, the Debtors put the full amount of the $18,500 trade-in-credit received from the Silverado into the purchase of the Chrysler to have the lowest monthly car payment possible. Based on the facts and circumstances surrounding the Silverado, coupled with Mr. Chedda's testimony, the Court finds that the Debtors' failure to list the trade-in/transfer of the Silverado was not done with fraudulent intent. Likewise, the Court finds that the Debtors' failure to list the Sonata and Altima was not done with fraudulent intent. The Debtors both testified that these vehicles were always intended for their son and daughter and that they did not view gifting the cars to their children as transfers. Mr. Chedda testified that his son had been driving the Sonata since at least 2018 and that he officially transferred the car to him when he completed basic training in the Air Force in 2020. The Debtors also testified that the Altima was purchased with the intention of being their daughter's car, that she is the sole driver of the Altima, and commutes to college and work in the car. When Mrs. Chedda was asked if she thought gifting the vehicles to her children looked suspicious, she replied that based on her feelings as a parent she did not think so. The Court believes the Debtors openly and honestly testified that their intent was always to gift the Sonata and Altima to their son and daughter at the appropriate age. Therefore, the failure to list the transfers was not done with fraudulent intent.

Finally, the Court will discuss the Trustee's allegations as to the Debtors' failure to list the correct balances in their Vystar Checking and Savings accounts. This Court has previously recognized that "[a]mounts deducted post-petition from a debtor's bank account to pay for pre-petition debit card transactions are property of the estate." In re Rumptz, 2020 WL 2462528, at *7; see also In re Gardner, 2015 WL 1579586, at * 6 (Bankr. N.D. Ohio Apr. 3, 2015). Based on the Debtors' testimony, it appears they mistakenly believed that the balance listed in their

checkbook, which factored in checks that had been written but not yet cashed as of the petition date, was the accurate number to list on their petition. Although the Debtors did not use a check register to balance their Savings Account, they testified that if they knew of a large expense which they needed to withdrawal money for, they would account for that. Mrs. Chedda testified that the $1,500 withdrawn from the Savings Account two days post-petition, was for a homeowner's deductible for a roofing job, and that the remainder of the funds went to pay their attorney's fees. These expenses account for why the Debtors listed their Savings Account balance as $500 instead of $2,000. Although the Debtors improperly listed their account balances, the Court finds that the Debtors did so without fraudulent intent.

## Conclusion

This Proceeding should serve as a cautionary tale for bankruptcy practitioners. The filing of a debtor's schedules is done under oath and with the penalty of perjury. A misunderstanding by a debtor, that results in a material misstatement in the schedules, can unfortunately lead to the denial of a debtor's discharge, especially if it is not timely identified and rectified. The most problematic issue in this Proceeding is the undervaluation of the Chrysler which arose because of Mr. Chedda's erroneous valuation methodology. The relatively young age and condition of the vehicle alone should have raised a flag for the Debtors' attorney to inquire why the valuation listed for the Chrysler was so low. Further, once the error was identified at the Meeting of Creditors, the Debtors' schedules should have been *promptly* amended.

As discussed above, the Court observed the Cheddas to be honest but unfortunate debtors, trying to navigate a difficult financial time, amid equally challenging life circumstances. The Court also notes, that in addition to turning over the Motorcycle to the Trustee earlier in the case, the Debtors also timely complied with the Court's directive to turn over their Chrysler and RAV4, presumably leaving them without vehicles. The Debtors also appeared to be cooperative

and forthright throughout the bankruptcy process, including the 341 Meeting of Creditors and Rule 2004 Exam.

While this was not an easy case, due to the Debtors' various missteps in filling out their Schedules and SOFA, the Court does not find the facts and circumstances of this case warrant a denial of their discharge pursuant to §§ 727(a)(2)(A) or (a)(4). However, practitioners need to be mindful of potential landmines that can result from schedules not being adequately vetted prior to filing them with the court. The United States Trustee and Chapter 7 Trustees are under a statutory duty to investigate material misrepresentations that are unearthed in a debtor's schedules and SOFA. To avoid unfortunate situations, such as the one which transpired in this Proceeding, the Court implores practitioners to take the time to explain the significance of accurately filling out schedules to their clients, to question their clients when red flags arise, and promptly amend schedules when material discrepancies are identified. Failing to do so may put a debtor's discharge, the very essence of why one files for bankruptcy, at risk.

The Court will enter a separate judgment consistent with these Findings of Fact and Conclusions of Law.